JOINER, Judge,
concurring specially.
The State of Alabama has filed a petition for a writ of mandamus asking this Court to direct the Clay Circuit Court to set aside its May 24, 2016, order granting L.D.B. youthful-offender status. Because the State’s petition was not filed within a presumptively reasonable time and because the State’s petition does not “include a statement of circumstances constituting good cause for the appellate court to consider the petition, notwithstanding that it was filed beyond the presumptively reasonable time,” see Rule 21(a)(3), Ala. R. App. P., I must concur with this Court’s decision to dismiss the State’s untimely petition. I write specially, however, to note that, had the State either filed a timely petition or demonstrated “good cause” for its untimely filing, I would be inclined, to issue the writ.
In this case, the Clay County grand jury indicted L.D.B. for one count of murder, see § 13A-6-2, Ala. Code 1975, for “intentionally causing the death of Jolee Nicole Callan, by shooting her with a pistol.” (State’s petition, p. 135, Exhibit C.) Because he was only 52 days shy of turning 21 years old when he allegedly shot and killed Callan, L.D.B. “applied to be tried and treated as a Youthful Offender, pursuant to ... § 15—19—1[, Ala. Code 1975].” (State’s petition, p. 135, Exhibit C.)
The Youthful Offender Act requires a circuit court to conduct an evidentiary hearing on a defendant’s application for youthful-offender status when that defendant has been “charged with a crime that contains as an element of the crime ... that the defendant ... intentionally killed the victim.” Thus, the circuit court, on May 24, 2016, 'conducted an evidentiary hearing on “the allegations of the crime and the extent of injuries of the victim.” § 15—19— 1(c), Ala. Code 1975.
At that hearing, the State presented evidence that tended to establish the following: On August 30, 2015, L.D.B. telephoned emergency 911 and told the operator that he had “murdered [his] ex-girlfriend” on the Pinhoti Trail at Mount Cheaha. (State’s petition, p. 33, Exhibit A.) Additionally, L.D.B. told the operator where law-enforcement officers could find him. When a law-enforcement officer with the Oxford Police Department found L.D.B. and took him into custody, L.D.B. told the officer that the “murder weapon was in the backseat of his car.” (State’s petition, p. 33, Exhibit A.) Additionally, L.D.B. told the officer that he and Cal-lan had
“decided to do a suicide pact; that they would go to a place in Mount Cheaha and jump. [L.D.B.] said he brought a gun for backup just in case they couldn’t go through with it. [L.D.B.] also stated that [Callan] did not want to see it coming and that he shot her in the back of the head.”
(State’s petition, p. 34, Exhibit A.) L.D.B. explained that, after he shot Callan, he “threw her body off the cliff.” (State’s petition, p. 34, Exhibit A.)
Shanon House, an investigator with the Clay County Sheriffs Department, was dispatched to the Pinhoti Trail to investigate the murder L.D.B. said had occurred there. According to Investigator House, *262 when she arrived at the Pinhoti Trail she was led by other law-enforcement officers to a cliff from which Callan’s body.had been thrown. Investigator House explained that she had to climb down approximately 40 feet to get to Callan’s body. She further explained that, after getting Callan to the morgue, the coroner discovered that Cal-lan had been shot twice—one shot “in the back of the head, and the other one was point-blank in between the eyes.” (State’s petition, p. 31, Exhibit A.) According to Investigator House, Callan had a “burn mark” right between her eyes, which, she said, came from- “the barrel of the gun.” (State’s petition, p. 13, Exhibit A.)
Investigator House testified that she spoke with L.D.B. about the murder and that he explained that he shot Callan.“in the back of the head” then “rolled her over and shot her again between the eyes and then [threw] her off the cliff so a walking by family or whoever else walked by the trail would not see her.” (State’s petition, p. 35, Exhibit A).
■ Although L.D.B. claimed that he and Callan had a “suicide pact,” Investigator House explained that her investigation revealed no evidence that such a pact existed; . rather, she explained that text messages between L.D.B. and Callan revealed the following:,
“From my understanding, ... I do believe at one time [L.D.B. and Callan] wfere cohabitating; they were living together. They broke up, and I do believe that she had started seeing someone else. And [L.D.B.] had been threatening to commit, suicide; that he was constantly talking about it. And then [Callan] finally broke down and said, ’Yeah, I’ll go hiking with you for one—you know, one last time.’, ■
[[Image here]]
“I think [Callan] referred [to] it as a symbolic reason.”
(State’s petition, pp. 36-37, Exhibit A.) Investigator House explained that Callan then drove to L.D.B.’s house and together they drove approximately an hour and 15 minutes to Mount Cheaha where, upon arriving, L.D.B. shot Callan and threw her body off of a 40-foot cliff.
The State also presented to the circuit court statements from two inmates—Sha-hiem Ackles and John Morrison—in which the inmates claimed that L.D.B, admitted to killing Callan because he “couldn’t see her with anybody else,” explained that he did not feel any remorse for shooting her, and contended that “he would not have gotten caught if he had not told on himself.” (State’s petition, p. -40, Exhibit A.)
Additionally, at the evidentiary hearing, L.D.B. presented the testimony of Dr. John R. Goff, a clinical neuropsychologist, who explained that he had performed several tests on L.D.B. and had concluded that L.D.B. has Asperger’s Disorder.. According to Dr. Goff, L.D.B.’s disorder would make it difficult for him to assimilate in a prison setting.
After the evidentiary, hearing, the circuit court issued- an order granting L.D.B. youthful-offender status, finding that if it
“were to deny youthful offender to [L.D.B,,] whose only prior offense was the running of a stop sign, and who, immediately following the offense, called 911 and admitted to the offense, the only .... realistic basis, upon which this court would take that action would be the seriousness of a charge of. murder, and yet Watkins[ v. State, 357 So.2d 156 (Ala. Crim. App. 1977),] prohibits this court from doing that. Perhaps this court could recite the evidence and state that youthful offender status is denied due'to that evidence; however, the actual, although unacknowledged, reason for denial would still be the seriousness of *263 the charge, disallowed by Watkins, supra, and this court elects to take seriously the mandates of our Court of Criminal Appeals.”
(State’s petition, pp. 135-36, Exhibit C.)
Thereafter, the State moved the circuit court to reconsider its order granting L.D.B. youthful-offender status, arguing that, although Watkins v. State, 357 So.2d 156 (Ala. Crim. App. 1977), prohibits the circuit court from denying youthful-offender status based on the seriousness of the charged offense, the circuit court may consider the nature of the facts underlying the charged offense as a sufficient reason for denying youthful-offender status.
On June 14, 2016, the circuit court issued an order denying the State’s motion to reconsider. In that order, the circuit court acknowledged the “legal premise that the nature of the fact situation on which a charge is based may, alone, be a sufficient reason for denying youthful offender status. Ex parte Farrell, 591 So.2d 444, 449 (Ala. 1991).” The court, however, concluded:
“It is difficult to imagine a set of facts justifying a charge of murder which would not provide a strong motivation to deny youthful offender; however, Farrell, supra, additionally affirmed the previous state of the law, that the nature of the charge, alone, is an insufficient basis upon which to deny youthful offender. It would appear, then, that the facts would need to be somewhat more egregious than simply intentionally causing the death of another, e.g., in the course of a robbery or conducted in a particularly brutal or callous manner or perpetrated against an infant or a child.
“Considering the prohibition against basing denial of youthful offender status simply on the nature of the charge, this court does not find a fact situation in this case which takes this matter beyond the pale of the nature of the charge, such as would mandate or even justify denial of youthful offender.”
(State’s petition, pp. 144-45, Exhibit E.)
With regard to a circuit court’s decision to grant or deny youthful-offender status, this Court has explained’:
“ ‘A trial court has almost absolute discretion in deciding whether to grant or to deny a defendant’s application for youthful-offender status, and this Court will not overturn such a decision absent an affirmative showing that the decision was arbitrary or that it was made without some investigation or examination of the defendant. Burks v. State, 600 So.2d 374 (Ala. Crim. App. 1991). The trial court need not articulate on the record its reasons for denying a defendant youthful-offender status. Reese v. State, 677 So.2d 1239 (Ala. Crim. App. 1996). “All that is required is that the trial court undertake an examination of the defendant sufficient to enable it to make an intelligent determination as to whether, in its discretion, the defendant is eligible for treatment as a youthful offender.” Gamble v. State, 791 So,2d 409, 419 (Ala. Crim. App. 2000) (citing Fields v. State, 644 So.2d 1322 (Ala. Crim. App. 1994)). “Generally, the trial court considers the nature of the crime charged, any prior convictions, the defendant’s age, and any other matters deemed relevant by the court.” Reese v. State, 677 So.2d at 1240.’
“Murphy[ v. State], 108 So.3d [531] at 539 [(Ala. Crim. App. 2012)].”
Foye v. State, 153 So,3d 854, 861 (Ala. Crim. App. 2013) (emphasis added).
Although I recognize that a circuit court has “almost absolute discretion” when determining whether to grant or deny youth *264 ful-offender status, here, after examining the State’s petition and the exhibits the State attached to that petition, I am not convinced that the circuit court truly considered “the nature of the crime charged” and the facts underlying that charge when it concluded that the “fact situation in this case” was not so “egregious” that it went “beyond the pale of the nature of the charge, such as would mandate or even justify denial of youthful[-]offender” status. Indeed, the nature of the facts underlying the offense charged in this case were calculated, callous, and egregious and would, standing alone, justify denying L.D.B. youthful-offender status.
As explained above, the State presented evidence indicating that L.D.B. lured his ex-girlfriend, Callan, to his house by telling her that he wanted to go hiking at the Pinhoti Trail. After making the nearly hour-and-15-minute drive to the Pinhoti Trail, L.D.B. shot Callan in the back of the head, rolled her body over and shot her between the eyes at “point-blank” range, and then threw her body off a cliff. Although L.D.B. claimed that he and Callan both intended to commit suicide, he told two other inmates that he killed Callan because he “couldn’t see her with anybody else,” that he did not feel any remorse for shooting her, and that “he would not have gotten caught if he had not told on himself.” Moreover, at the time Callan was killed, L.D.B, was not a minor; he was only 52 days short of turning 21 years old.
Given the calculated and callous nature of the facts underlying the charged offense in this case and given L.D.B.’s age at the time the offense was committed, I am convinced that there existed only one possible result for L.D.B.’s application for youthful-offender status—denial. Because the circuit court granted that application, I would conclude that the circuit court, in doing so, exceeded its “almost absolute discretion.” As it stands, however, the State’s petition for a writ of mandamus was not filed within a presumptively reasonable time, and this Court cannot issue the writ the State seeks in this case.
Thus, although L.D.B. committed an offense for which he could receive a possible maximum punishment of life imprisonment, the circuit court has determined that L.D.B.’s alleged actions were not so “egregious” as to warrant denying him youthful-offender status. Thus, L.D.B. faces, at the worst, a possible maximum sentence of three years in “the custody of the Board of Corrections.” See § 15-19-6, Ala. Code 1975.